This seems to be Mr. Ryan's day. Well, Your Honors, again, this is a substantial evidence case. There is one additional wrinkle here, and that is that Ms. Halim is married to an Indonesian citizen who has been granted asylum. They were married after he was granted asylum. Had it been before, then we wouldn't be here today. Right. She was repeatedly harassed in Indonesia because of her ethnicity and also because of her sex. She articulates several incidents beginning in August of 1992. And one incident involved five native Indonesians who were 17 or 18 years old. They stopped her and said, you Chinese, give me all your money. Robbed her of her money in her wallet, touched her offensively on her breasts and buttocks. And while they were touching her breasts and buttocks, she testified that they said, you Chinese woman, you. What's interesting about Indonesia is that the country does not have any laws that criminalize at least sexual harassment. And so it doesn't appear the government takes seriously that particular crime. It also requires two witnesses to prove up sexual harassment. And in this case, for instance, it would not have occurred. That is, she would not have had two witnesses. And so she's in many ways barred from any legal recourse under the law because of her gender and her ethnicity. The gender issue goes to, of course, membership in a particular social group. And that would be ethnic Chinese Christian women who are at greater risk of persecution than the general population in Indonesia. And I would invite questions at this point. Don't appear to be in. All right. Thank you. Thank you. May it please the Court, Brian Boyle for the United States. The claim to pass persecution is based on two incidents eight years apart, one of which was described by counsel. And that is really it. The two incidents were a 1992 unarmed robbery. Near as we can tell in Padang where she went to school. She was the victim of offensive touching in connection with that incident. And then eight years later when she returned to Indonesia in 2000, she was in a restaurant with her family and others. And the entire restaurant was robbed. All the patrons in the restaurant were forced to surrender their belongings. Now, I will assume for the moment that these incidents were racially motivated. The IJ's, the immigration judge's decision is a little bit unclear on that point. But making that assumption, I think the immigration judge reasonably determined that these incidents separated by eight years do not amount to the sort of extreme mistreatment that qualifies as persecution. As the IJ put it, these are the, and I'm quoting, these are the kinds of incidents that happen in probably every country in the world between one ethnic group and another. And I would emphasize as well that these aren't acts of the government. They weren't alleged to be acts in which the government was complicit. There's very little evidence that the government authorities were unable or unwilling to police against robberies. The 1992 incident wasn't even reported to the police. And the 2000 incident was, and there was no information on what the result of that investigation was. And thus, absent any evidence of past persecution, it fell to Petitioner to prove a reasonable prospect of persecution were she to return to Indonesia. And in this respect, her submission was based upon country conditions by and large, pattern and practice evidence, if you will. And I will concede that the record indicates that Indonesia has been marked by occasional intra-ethnic violence, most notably the May 1998 riots in the Chinese business district in Jakarta. Well, her family was at least, she was credible. The IGA made no findings with respect to credibility. Did not make an adverse credibility assessment. That is correct, yeah. And her family was attacked. During the, I'm sorry, were you finished? Yeah. During the May 1988 riots, her grandparents' home was stoned. Her grandparents escaped. I think her uncle was hit in the forehead with a stone, and they now live in Singapore, although they returned to Indonesia for visits. Her parents still live in Jakarta. They apparently were not the subject of violence in the May 1998 riots. But I want to emphasize that since 1998, and there's a State Department country report in the record, it is noted that violence against Chinese, incidents involving ethnic Chinese have dropped sharply since 1998. That the new government, you know, they transitioned from an authoritarian regime to a pluralist democracy. The new government officially promotes racial and ethnic tolerance. Some of the laws that counsel for the petition referred to that are anti-Chinese have been repealed, and that is in the record an example. A miracle? I'm sorry? There's been a miracle? A miracle? Yeah. I mean, it's hard to overcome the long ethnic difficulty in a couple of years with a new government and a new policy. Yeah, I would concede it's difficult, but the conditions, at least of the record, the conditions are different. And I want to let me make a couple more points, and then I want to get to the point that the petitioner herself went back to Indonesia after the 1998 riots. The law requiring racial ID cards, noting racial extraction on the ID cards has been repealed. That is in the record. I can get you the site. It's noted in the country report that ethnic Chinese traditions are now openly practiced without violence. There's seven Chinese newspapers in circulation. There's even a TV station that broadcasts in Chinese now, whereas those traditions before were quite clearly repressed. Let me make the point about the petitioner's own behavior. She returned to Indonesia to visit her father who was having health problems. In 2000, two years after the 1998 riots, spent five months, or the better part of five months, in the country. And I think that speaks volumes about the, you know, whether those country conditions truly can provide the basis for a well-founded fear of persecution. Let me get back to something that Your Honor mentioned in the other two cases involving Indonesians, the need for some particularization, evidence of particularization, something that would show that if she returned to Indonesia, she would particularly come to the attention of those who would persecute. And I don't think there is any evidence of that, Your Honor. I think, as the immigration judge put it, I think quite reasonably, it's clear that the petitioner herself was in the wrong place at the wrong time in 1992. She was in the wrong place at the wrong time at that restaurant in 2000. Well, she was in the wrong place at the wrong time, and she was the wrong ethnic. Well, let me focus on that for a second. The evidence that these were racially motivated was that in both instances, the thugs used the word, you Chinese, give me your belongings. And that's it. Now, I will assume that that indicates some racial inspiration, but the motive for the robbery was obviously money. That is the motive that typically characterizes robbery. And so I guess the question is, is there anything? Well, it doesn't matter if you want money, but you target only Chinese to get it. And you threaten to kill them. Well, Your Honor, I will concede that there's some evidence that I.J. could reasonably conclude that these incidents wouldn't have occurred, that the victims were selected by virtue of the fact of ethnicity. I will concede that, that a reasonable judge could conclude that. I'm not sure that's compelled. And I would go on to make the further point that these robberies, separated by eight years, don't amount to the sort of extreme mistreatment that the court has found to merit a conclusion of persecution in other cases. I suppose the precedents that I find most useful in this case are those involving Fiji, where you have a long history of ethnic strife between native Fijians and Indians who were on the island. There are a series of cases. There's a Singh case, two Prasad cases, Sarita and Chand. And I think if you stack up the incidents that are alleged here against the incidents that were reviewed in those cases, I think it's very easy to conclude that this, even if you were to conclude that there was sufficient evidence to establish persecution here, it is very, very difficult to conclude that no reasonable fact finder could find otherwise. An example, the Prasad case from 1995. The evidence there was that the house was repeatedly stoned. There were attempted thefts repeatedly that Fijian military personnel harassed the petitioner's wife. Well, our law is also, yes, but that was quite a while ago. We said that in Hotsaw v. Ashcroft, we said in 2003, we said that the greater the risk to all members of the group, the less evidence of individualized persecution must be adduced. Correct. And I would say there is some evidence that there's definitely strife in Indonesia, less, considerably less than there was in 1998. Let me just mention a few things that I found significant from the record that Your Honors may find significant as well. I mentioned the fact that attacks against Chinese have dropped sharply since mid-1998. That probably resulted in the petitioner's conclusion to go back to Indonesia for that visit. I'll quote from the administrative record at 364. Quote, the law officially embraces six religions, including Catholicism. From the State Department report again, page 368, there were no reports of religious detainees or prisoners during the period covered by the report. 369, quote, there were markedly fewer reports of specifically anti-Chinese violence during the period covered by this report. And from the San Francisco Chronicle in 2000, the headline which I found significant was, after decades of racism, new government gives Indonesian Chinese reason to hope.  You have used it, Your Honor. The record is complete with that. Thank you, Your Honor. Reason to hope. Thank you. I'd like to begin, Your Honor, with that very article, Indonesia's Chinese Fight Back. San Francisco Chronicle, June 13, 2000, page A10. That's on page 401 of the administrative record. Over on page 402 in the left-hand column, the underlying portion, during political and economic turmoil, they, the ethnic Chinese, have been frequent scapegoats. Mobs have killed and raped ethnic Chinese residents and looted and destroyed their businesses in riots in 1973, 1974, 1980, 1997, and 1998. There is a box on the upper portion of the page. It says that 50 laws discriminate against the ethnic Chinese. So a Chinese social organization asked the government to investigate the human rights abuses during the 1998 riots, and I quote, no one has been brought to justice for the deaths of 1,200 people and the rapes of dozens of ethnic Chinese women. This is an ethnic Chinese Christian woman? Yes, Your Honor, she is. So I dare say that that article is very powerful evidence in her favor. I want to emphasize again, this is a country that has anti-Chinese laws. But Counsel, you still have to show some specific application to her. I mean, you have the environment of hostility, but you also need to show specifically persecution vis-à-vis the petitioner. Yes, Your Honor, and we believe those two incidents which occurred are powerful evidence of that. So again, the equation would be personal experiences plus pattern or practice evidence, and that would include country conditions. And then country conditions by itself equals, we believe in this case, at least a well-founded fear of future persecution. In addition, her husband, again, has been granted asylum, and he did testify. So, Counsel, just so I can put your argument in a broader perspective, is it your argument that any person of Chinese ancestry from Indonesia pretty much has a presumption of persecution because of the country's history? No, Your Honor, it isn't. And if I may just quote from another Fijian case, Singh v. INS 94, Fed 3rd, 1353 of 1359. The circuit in that case said, We reject the notion that an applicant is ineligible for asylum merely because all members of the persecuted group might be eligible for asylum. So one cannot say, well, if she's eligible, they're all eligible. The court rejected the notion. That's how I understand your argument. When you were quoting from the newspaper articles that talked about the volatile history between these two ethnic groups, what was your purpose for citing that? Well, first of all, the government cited that article. The second is that it does lay a very, very strong foundation for these cases to have repeated riots. And we're not even talking about the riots that happened in 1965 during the coup. We're not talking about the fact that the rivers ran red, that the ethnic Chinese were slaughtered in untold numbers. Unfortunately, that happens in a lot of countries that you have, you know, very bloody uprisings. Right. And as we state, it's part of the equation. It is not the only factor in the equation. Thank you. Thank you, Judge. The case just argued is submitted for decision. We'll hear the next case, which is Wajah. How do you pronounce that, Wajah? I don't think I'm going to get this one right, Mr. Ryan. This is, how do you, this is Wajah? Wajah? Wajah. Wajah. Wajah. Thank you. Wajah. The second one. Wajah.
judges: Schroeder, Tashima Rawlinson